I represent both plaintiffs, Robert Chavez and Lisa Chavez, in this appeal before this honorable body. I've submitted both a brief and a reply, and I don't want to repeat myself to this court, but I do want to emphasize one particular point, and that is the protected activity that the lower court dismissed and only concluded that it occurred one time in 1998, and thus dismissed the temporal proximity of the adverse acts. It is not in dispute in this case that Mr. and Mrs. Chavez, Mr. Chavez specifically, engaged in protected activity on several occasions, the first time being in 1998, but again in 1999 in May, again in January of 2000. Can you be specific? Sure. In May of 1999, he pledged a complaint to Lt. Von Lutzlo that he was being treated differently because of his disabilities, and then he left on a stress leave after that, where he stayed on stress leave from the City of L.A. from May of 1999 until March of 2000. However, during this stress leave, the City of L.A. continued to harass him in a terrible way by sending helicopters to his home to literally buzz his home while he was off from work. They weren't trying to give him a ride to work. No, they weren't trying to give him a ride to work, Your Honor, and there was evidence submitted to the district court that supported this because there were... What evidence was there that the city or supervisors sent the helicopters, other than that they just happened to appear? Your Honor, the plaintiffs live in Alhambra, and each time that these helicopters appeared in Alhambra, if they were doing police work, there would be no reason for them to shake and rattle the homes of these individuals that lived there. And not only was plaintiff's home targeted, because the homes are so close in proximity, there were affidavits submitted by Benita Malaro, a tenant that lived in the area. There was another one by Giselle Laurel. There were several affidavits submitted in support of this summary judgment motion that actually supported and corroborated these helicopters that were flying very low with LAPD insignias on it. That were unusual. These people had lived in the area for 26-plus years, Your Honor. So, therefore, it wasn't something that these people just made up. They have no interest. Excuse me. Sure. Just clarifying your answer to that, I'm not sufficiently familiar with the geography of Los Angeles, although I've lived here for more years than I care to admit. But Alhambra and Arcadia, to me, are very similar-sounding places. Is Alhambra an incorporated city? Alhambra is a city of its own, Your Honor. But it's a city of its own. It has its own zip code. Like Beverly Hills and Santa Monica, and not like Hollywood. Hollywood is just a place. Right. Like Ladera Heights is just a place. So, Hollywood, if I understand correctly, is under the jurisdiction of LAPD. Right. Whereas, I gather, Alhambra is not. No, it is not, Your Honor. Because I know sometimes they contract, police departments contract, for example, the town I live in contracts with the sheriff. Right. But your position is that Alhambra is a city not under the jurisdiction of the LAPD. That is correct. But they do work together, Your Honor. I'm sure all the police forces, at least even in this case, I learned- So, Alhambra doesn't have its own helicopters, maybe? It has its own police force. And so, if they needed helicopter help, they might- They might solicit LAPD to come over. I would not venture to say that that's not the truth. But this is not what we have going here, is helicopters venturing over to do work. How do we know that? Well, because if this is how- No, we don't- No, let me just say this, is that the testimony that was given in this case, or the investigation conducted by the police department, was not truthful. So, therefore, we can only assume that why would the LAPD not be truthful about an investigation that they were conducting if they didn't have something to hide? Did you conduct discovery with respect to this helicopter operation? Yes, I did, Your Honor. What did the discovery show? The discovery showed that the times that Mr. Chavez had alleged these obscene visits by the police department, that they were, in fact, in his area. Now, what the discovery further- that the helicopters were logged off somewhere near the vicinity of Mr. Chavez's home. The problem that we had there is that in the discovery, Mr.- one of the police officers who conducted it, Oshinko, says, you can't see the seal because there is no seal on this particular helicopter that Mr. Chavez said was at his home. Well, that proved to be untrue. That was the first untruth. The police helicopter that did come to Mr. Chavez's home did bear the seal of the city of L.A., was distinguishable. Mr. Chavez did identify it. But the investigation showed that there was no such helicopter that Mr. Chavez alleged to be there because they wanted him to make- they wanted the department to believe that he was crazy, that these helicopters were not coming there to his home to do what he said to do. Now, what the discovery further in support of your question is, people lived there 26 years, Your Honor. Why all of a sudden do we have four individuals in that vicinity making allegations of their home as shaking and rattling and rolling? Why all of a sudden? And why has it stopped? I mean, why was there only a period of- a defined period of time that these helicopters were coming to Mr. Chavez's home? Only the period of time that he was making complaints of discrimination, Your Honor. The city says that you didn't raise the nuisance claim with the district court at all, and now you're talking about critical disputes of fact that may or may not be material. Where does this take you? Your Honor, the nuisance claim was a one-sentence claim in the brief. The brief in the district court is 25 pages limit, and we did the best we could do with so many issues that we had to argue. There are five causes of action in this case, and because there are so many actual adverse activities that the police department- Did your one-sentence argument create a dispute of fact that the district court ignored? Is that what happened? That is correct, Your Honor. Just a one-sentence dispute. What did the one-sentence say? The one-sentence says that the nuisance- if the Fourth Amendment claim survives, the nuisance claim- if the Fourth Amendment claim survives, violation of my client's Fourth Amendment rights, then the nuisance claim definitely follows because it's a lower standard. Your Honor, it may have been deficient at that point, but the court didn't even address the nuisance in our brief as well. What standard do we review this summary judgment? Under Rule 56. Oh, de novo, Your Honor. You get to review it as if there was no district court ruling at all. This Court has that right. Okay. Well, is there any evidence from which a jury could infer that these helicopter operations, rather than being in the regular course of business, were maliciously or were the intent of injuring the plaintiff? All we really have is your say-so that apparently they hadn't been there for 26 years. What else do we know? Did you depose any police officers or others to determine why they were there, try to determine why they were there? Your Honor, yes, I did, and each one of the statements were contradictory, based even upon their own documents. On one occasion, the officer that was flying the helicopter said that he was wishing people Merry Christmas in the area, and I asked him, so when did you wish these persons Merry Christmas in the area? He said, close or near Christmas. I said, well, that would be December 24th. I can't specifically recall, but I know it was close to Christmas. Well, yet and still in their investigation, the police department writes that it occurred on December the 1st, 1999, because their paperwork does not put this officer with this particular plane over Mr. Chavez's home on any other day but December the 1st, wherein, in fact, it occurred on December 24th, 1999. Also, there was testimony that Sergeant Berglund, who had brought a malicious investigation against Mr. Chavez in 1998, was actually friends with this officer that flew the helicopter. This all seems quite tangential. I would think that the police department maintains a log for helicopter operations that would reflect each mission and the purpose of it. Now, did you examine the logs, and what did they show? The logs showed that they were not at Officer Chavez's home on the times that the witnesses saw the helicopters at Mr. Chavez's home. There were some consistencies, but there were some discrepancies, Your Honor, and those were all presented in the evidence to the district court, which this court does have a copy of. We actually pointed it out in our genuine issues of material fact, all of the inconsistencies between the log by the department and the declarations of the witnesses, but the point that I was trying to make is the protected activity. There are claims of employment discrimination in this case, not just … You brought your claim of disability or imputed disability discrimination. Right. I have a handle on that. I'm a little bit more … let's see, with respect to the retaliation claim. If you file a complaint saying, I'm being treated badly because of disability, that winds up being protected activity and giving us yet another independent claim? I mean, it's one thing if you're sort of speaking out about, you know, you're saying there's theft in the police department or, you know, they're using helicopters to wish people Merry Christmas, you know, at public expense. You know, if you do something like that, that's sort of protected First Amendment activity. You are, you know, speaking out on public issues to the public, but if what you're doing is filing a complaint saying, hey, you're treating me badly on disability, is that enough to allege protected activity? Well, Your Honor, on March 24, 2000, Plaintiff filed a claim with the Department of Fair Employment and Housing alleging disability discrimination, disparate treatment and retaliation. After March 24, 2000, his whole existence at the police department was not the same. I mean, here's the adverse acts that occurred shortly thereafter. He was sent to one doctor, a city doctor, Dr. Angela Donahue, who actually contacted Lieutenant Crecce and told him, hey, Officer Chavez is able to report to full duty. This is an officer that since 1989 has accommodations as tall as I am. I mean, he is a good patrol officer. He finally gets his commitment to go back to work by the city doctor. What does the department do? They do not return him back to full duty as a patrol officer. They keep him in the guard room and the kit shack where he's stuck in this closed-in environment in 77th where there's rumors going on that he's crazy. He sees helicopters. He sees internal affairs coming out of the wall. Didn't the city procedures requiring him to get clearance from Dr. K in addition to the BSS clearance and that the evidence shows that he didn't furnish the records to Dr. K so that he was never cleared by him? Your Honor, the city has a policy that they write in this manual, and it's policy number 3711-20. That is their policy. The police department doesn't just throw words in a book for no reason at all. They put it there because that is their established policy. They violate that policy. It is obvious from Lieutenant Crutchie's note in his watch commander log that on 320-2000 he says and he writes, the slip that he came back to work was his personal doctor. He must see a city doctor. The city doctor sees him. She evaluates him. She reports back to him. This other doctor came in. I thought the procedures required the clearance from Dr. K, and Dr. K couldn't give the clearance until he'd received the requisite records from plaintiff, and he never received them. That's what the discussion showed in June of 2000. Your Honor, the evidence in that case does not show that. That is the district court's position. That was the reason why summer judgment was granted. That's not what the evidence in this case shows. Even Lieutenant Von Lutzow testified that the male doctor phoned Lieutenant Von Lutzow and told him that Officer Chavez was clear. That was done in April of 2000. The court had both of those things in front of her when she made that assertion that you're making that Mr. Chavez did not follow the policy. I know what happened in April, but I thought that in May the superior officer said we've got to have more clearance before we can let him go back to work, and that's when the process started with the BSS and Dr. K. No, it all happened in March, Your Honor. The record in this case, looking at the district court's record, she cites two improper disputes of facts. I mean, just for instance, when she talks about the reason why Officer Chavez has to go see the district court, the behavioral science doctor, she uses genuine fact 11. That is not the correct fact. It's genuine fact 10. I mean, the whole thing is misconstrued. So this, if you look at the district court's decision, you don't get the full picture of what the evidence was, and her excuse was I don't have to mind the record to find it. Well, that's true. You don't have to mind the record, but when you limit the 14-point type to discuss five causes of action, we have these genuine issues of material fact. The court assumed the reason was, if you want to know the facts of the case, are there any facts that a jury can take and make a decision in behalf of the plaintiff? In this case, the plaintiff didn't get that. The only thing the plaintiff got was the defendant's brief retyped, and that's the reason why we're here in this case. I would like to address some of the points brought up by appellant's counsel, and it seems that we're way out in left field in terms of what the plaintiff is trying to do, and it's not all that difficult. The pertinent facts in this case really begin in 1999, when Oscar Chavez goes off on his leave. His own doctor declares that he is not able to do his job because of a mental disability. Basically, he's out on stress. The city's policies are very clear in the declaration of Lieutenant Lutz, which is in the record in this case. The policy is put forth. The counsel has an issue with the fact that it's not in the LAPD manual itself, but this is a policy that the police department follows, and the policy is that when an officer … If it's not in the manual, what do you mean that it follows it? It is an unwritten policy, Your Honor. And Lieutenant Lutz, as the … Is that an unwritten policy? Yes, Your Honor. It is a policy … You mean you've got a manual, and then you've got an unwritten policy? Yes, we do, Your Honor. And you're standing up in federal court and saying this with a straight face? Absolutely. I don't think so. You seem to be smiling. Well, I … The policy is … You must be kidding. No, Your Honor.  Any employer … Do you think any private employer would get away with that? You know, we've got a manual, but, you know, we've got an unwritten policy. We do something else? Your Honor, I believe in an organization as large as the Los Angeles Police Department. I think the larger the organization, the more you have to nail it down. And if you have no procedures, I can see having some sort of a formal policy, perhaps, to fill in the gaps. But when you have a procedure that has certain requirements, how can you say, oh, but we do something else instead? Well, but it's not a something else instead. Isn't there at least an issue of fact as to whether this wasn't just invented for your benefit of this case? I don't think so, Your Honor. Well, why not? Here's why. I mean, isn't the fact that you've got a written manual that provides a different procedure … Isn't that something a jury could say, no, they're lying, they're making this up completely, they're trying to save their bacon? I would agree. How could we possibly say with a straight face that a jury, when presented with a book on the one hand, and somebody else coming and saying, no, we do things differently on the other hand, can't say, well, you know, we think the book is it, and this guy is lying to avoid, you know, getting sued. Well, there's a very simple explanation. Tell me. I'm ready. There is no dispute between the policy manual of the Los Angeles Police Department, the big, thick book, which is policy, and this unwritten policy or procedure that is followed by the department. They added a requirement. It's not another layer. This one says you can go back to work if you do this. This one says even if you do this and you get all the clearances, we can add another level of clearance. No. Well, not in this case. That may be another case, but not in this case, Your Honor. He got the clearances required in the book, right? No, no, no. No? Okay. The book does not address the book, and it's not an issue in this case. You've got something in the record. Can we talk about the real things? Where is it in that? We have the declaration of Lieutenant Lutz, which states the unwritten policy that I'm talking about. Okay. And where is that? That is, I believe it's supplemental excerpt of record. I want to say it's 11, but I'm not absolutely certain. You see what happens to people in this courtroom when they say things that don't make sure. Absolutely. I didn't bring them with me this morning. I looked at them this morning, but I didn't bring them with me. Well, no, I'm prepared to address the Court's concerns. Okay. So tell me where it is. It's harder to do if you don't have it with you. In the table of contents. If the Court doesn't mind. Go back, go back, talk into the microphone. Your Honor, what I have given you is tab nine of the supplemental excerpts of record which were filed. Page number 201. And that is the declaration of Lieutenant Leslie Lutz. Ms. Jackson, you follow that? Okay. Opposing counsel is entitled to know, too. Okay. Okay. So where is the declaration? In paragraph five. Paragraph five. Lieutenant Lutz gives the unwritten policy that I have been referring to. I have my custom and practice. Okay. Custom and practice is very different for a policy. All right. Custom and practice is what we usually call not following the policy. You know, we have a policy, but we have a custom and practice of ignoring the policy. Well, I don't. The policy is very different. Do you understand the difference between a custom and practice and a policy? I mischaracterized it, Your Honor. Well, you misstated the record. It's what you did. It's a custom and practice, then. But you understand the difference? Yes. Okay. So it's not the kind of thing a lawyer would make a mistake about. A policy is something that's adopted. A custom and practice is something that maybe by accretion reflects actual procedures. But that's not a policy. A policy is something that's adopted as the official policy or the official procedures of the body. You are aware of the distinction. No, I am not. You stood there and said there's a policy and didn't have this thing here. You were sort of hoping to get away with that. Not at all. Because the record in this case. What did he say? It is my custom and practice. Yes. He doesn't say it is the policy of the LAPD, or he doesn't even say it is a custom and practice of the LAPD. He says it is mine. But he says that. That's even more different from a policy, isn't it? It is his custom and practice, but he. Just follow me. Yes. This is even more different from a policy, isn't it? To say I do things differently is really as different as you can get from saying this is the policy of the police department. But doing things differently is not really in dispute here. This is how the Los Angeles Police Department does, addresses the particular situation we have in this case. Where does it say that? He says this is what he does. For all we know, he does it because his supervisors haven't caught on to it. Well. Because this is what I do. The only point I want. This sounds like an admission more than anything else. The only point I want to make, Your Honor, is that he does that in his capacity as the officer in charge of medical liaison, which has the duties in the Los Angeles Police Department of addressing officers' medical records. Okay. So explain to me once again what if you go to a jury and plaintiff puts in the manual. Yes. The manual is just prepared and drafted and approved and has binding on everybody. Okay. On the one hand. And you come in and he testifies. I don't want to sort of put words in his mouth. It is my custom practice to do something else. But why a jury couldn't say once plaintiff cleared the manual. Because. Was entitled to come home to work and this guy can't sort of add something else. Going back to what I said originally, Your Honor, it is because the manual doesn't say to do something different. What Officer Lutz is saying is his practice or procedure is not different from what the manual gives. It is, as you said earlier, it fills in the spaces. I'm sorry. That are left by the manual. I'm probably misunderstanding the record. Did he comply with what the manual required? The manual does not specifically address how an officer coming back off of a lengthy stress leave is supposed to come back. Is Officer Lutz in the position holding a position as a policymaker within the department? Well, I think that is why I refer to this as a policy as opposed to just his pattern and practice. It's not my question. I think he is, Your Honor, because he is in a unique post where he has been directing how medical liaison conducts its affairs on behalf of the police department. He operates with the approval of higher authority and on behalf of the city. He certainly operates within the authority of the police department and certainly with with the authority of his superiors. And in that basis, he does bind the city by what he does. And it's his responsibility to determine whether somebody is fit to return to duty. No, Your Honor. It's his responsibility. He doesn't make that call. That call is really made by physicians or psychologists. And his pattern and practice, which Justice Kuczynski has referred to, is that when an officer is coming back off of a stress leave, because stress is one of those conditions that the California Penal Code addresses in terms of an officer having the ability to have a firearm, they are referred in the first instance to be a set. I'm sorry? You're talking, again, without making a specific reference to the document. Where is this policy and what exactly does it say? The policy. The manual. The manual does not address the situation we're here on today, Your Honor. What does it address? It addresses very generally, and what the plaintiff has pointed to, it addresses the ability to obtain officers' records, the ability to disseminate medical records that are confidential. That is what the policy addresses, what the manual addresses. And there's no violation here of that policy by what Officer Lutz did. So what Officer Lutz does is he says, in order for an officer coming back off of a lengthy stress leave, he must be cleared by BSS and by. . .     I don't know if it's been in the record since 1996. I'm not sure what you're referring to, Your Honor. I don't suppose you have opposing counsel's excerpts with record either? No, I just brought the briefs with me to court. I looked at those excerpts over the weekend. Counsel, do you have a cite to the firearm statute? Generally, it's penal code. I know it's around 832, those statutes there. Well, I'm a little puzzled about the role that Lieutenant Lutz – is that the name? Yes, Lutz. In this picture. He's responsible for what decision, for determining whether there's sufficient medical records to allow somebody to return to duty or just what? No. What does he do in the ordinary course of his business in this situation? In this situation, he would make sure that, as is stated in his declaration, his practice and procedure is followed. That is, that an officer is cleared by behavioral science services, and then that's for the firearm, and then that he goes to the city's occupational health services division for a fitness for duty evaluation and clearance. When those two things are complied with, then that custom and practice has been satisfied, and if the officer is cleared by the physicians of those two entities, he can go back to his normal patrol duties. And, Doctor, this officer lets make that decision whether it's been satisfied or not? Yes. Is that his responsibility? Yes, because he receives reports from the two entities. He's not deciding on the merits. He's deciding on the basis of the written report. Is that correct? He's deciding on recommendations from the two entities. Sometimes they're written, sometimes they're not. In this case... He did get a call from the BSS doctor, right, who said... He did. Well, yes, I believe he did. But that's not in the record in this case. What is undisputed is that Lieutenant Krecci... I know about it. Why isn't it in the record? Because Lieutenant Lutz in his declaration states that he didn't have a specific recollection of this particular case. What is undisputed, Your Honor, is that Lieutenant Krecci, one of the individual defendants, received a call from BSS clearing Officer Chavez to have his firearm. In other words, Doctor Donahue from BSS, who examined Officer Chavez, told Lieutenant Krecci, I don't have any problems with him at this time. That was basically the... So this is after he was... After it was arranged that the plaintiff go and be examined. They made an appointment for him. Yes. And he went and saw the doctor, answered all the questions. Right. And then the doctor who examined him called and said he's okay. Right. And then there was a second part to comply with, which is what Officer Chavez has a problem with. After Doctor Donahue cleared him... And the second part is what's in Paragraph 5 here. No, no, no. Let me go back. The first part is what you have in Paragraph... Well, maybe Paragraph 5 addresses both of them. The first part is going to BSS. The second part is going to OHSD for the fitness for duty clearance. It is there where... And where is that requirement? It's in Lieutenant Lutz's Paragraph 5, that you go to both BSS and OHSD. And this requirement of fitness for duty is nothing more than the one sentence at the end of Paragraph 5 of Lieutenant Lutz's declaration? In a very general sense, yes, Your Honor. I mean, the city has... Let me just get it straight. Okay. You have a procedure running the Los Angeles Police Department with 7 zillion police officers, and the procedure for letting them get back on duty after they've been out on disability leave is contained in the one sentence at the end of a paragraph in a declaration following a particular case. That's all the procedures you've got. That is the procedure, yes. Otherwise, they sort of make it up as they go along? Well, no, they don't make it up as they go along, because... Why couldn't he say, I need him to get approval of a governor? I mean, I don't know. I believe... Or the Surgeon General. I don't know. Is there anything at all other than this one sentence in this one paragraph that's prepared during the course of litigation when Mr. Lutz is... Is Mr. Lutz a defendant? No, he's not. Okay. When his buddies are defendants and his department is a defendant, his employer is a defendant, is there anything other than this one sentence that says, this is how we do it? There is nothing in the manual, if that's what you're asking me. Anywhere. Anywhere. Anything in the city code? Well, there are general procedures in the personnel department that every employee coming back from sick leave has to go through occupational health and safety to be cleared to come back, if they have some sort of a serious condition. And they need to have a fitness for duty examination? Yes. And only OHSD can provide that. And that's true of every officer who goes out? Well, it depends on the situation, Your Honor. It depends on the situation sounds to me like the answer to my question is no. It does not apply to every officer. That's true. In an absolute sense, it does not apply to every officer. Is there in a relative sense that it does apply to every officer? It does not apply to every officer. Okay. So the answer is no, right? It does not apply to every officer. Right. Okay. So is it a question of condition or is it indiscriminate, right? Or some other standard? It is a question of condition. And your basis for saying that is? In the record. Not what you've talked to people about. Your basis in the record. What can I look to? It is Lieutenant Lutz's declaration. And I have it here. Tell me where. How does he make a distinction? You said it doesn't apply to everybody. It applies to some people. It doesn't apply to other people. Right. And you're going to show me where he tells us whom it applies to and whom it doesn't apply to. Okay. That I cannot show you. Would you like to look at it? That I cannot show you. So in the record, there is nothing to distinguish those who get sent for this from people, from those who don't. It could be in basis of last name. A through K have to. L through Z don't. Could be. Or could be basis of color of hair. I think if you're talking about what is in the record. As far as the record is concerned. Okay. What is in the record is Officer Chavez's condition and his situation. So based on the record shown, the whole record here, that is what the issues that he has put forth. But the whole issue here is whether he was treated like everybody else or whether it made up a set of procedures for him in order to retaliate against him. So you can't say because it is in his way, this way in his case, that's a conclusive answer. You have to put it in the context of how everybody else is treated. If you have procedures that apply across the board. Well. He was treated just like everyone else. Here are the procedures. And I'm asking you once again, is there anything in the record that tells us how they decide who goes for this procedure and who goes for that procedure? Even the statement of one of your witnesses. Is there anything in the record? Only, no. Not to answer that specific question as to how they decide. Did you have an argument before the district court, an oral argument? Yes, we did, Your Honor. I take it that the way the argument went was the plaintiff claimed that because of disability, he was discriminated against by the department in the city. Right. Yes. And then you come forward and say there were medical conditions requiring examinations and return to duty. Right. With one difference there, Your Honor. It is Officer Chavez himself that said he had a medical condition that required him to be out. But yes, generally, yes, that's correct. And then the argument goes by the plaintiff again that this was all pretextual. Right. That's where the district court got hung up on this case and said, I find no pretext. Right. Yes. Now, what finding of fact could be made by the district court under all of the depositions, standards and everything else that was considered by the district court to come to the conclusion that there was a dispute of fact as to whether this conduct was pretextual or not? A finding of fact, Your Honor? To put it another way, what evidence was there of pretext to support it, to support the claim of pretext? The well. From our viewpoint, there was no evidence of pretext. It's not what you think. It's whether there was evidence that offered a pretext. In other words, once you give me the answer from their point of view. It's my question. So you said from your point of view, it's not. Okay. That satisfies some of the judges. But I would like to hear what their answer would be. Why don't you tell me? I believe their answer, Your Honor, is that if you look at all of the things that happened to Officer Chavez, much of it which comes from just his own statements, that all of that is harassing. All of it is retaliatory. All of it is discriminatory to some extent to him. And if you take the totality of the situation, that's the reason. That, I think, is the argument. Because there are no specific facts. We'll get a chance to see how good you guessed. Your time is up. Thank you, Your Honor. We'll hear from plaintiff's counsel. And you know what? You're probably going to get the same question. In fact, you can assume you'll get the same question. And I'm ready to answer it, too. I bet you are. Pretext. The reason why plaintiff argued that the defendant's reason was pretext was by their policy contained in Exhibit P of this court, page 177, 711.70, which is a specific Exhibit P. I got it. Page 177. 711.70. 711. It tells plaintiff. Return to duty. Correct. Can you tell us just what is this document we're looking at, which is a printed document, not an affidavit? Oh, I'm sorry. No, it's not. It came out of the policy manual. There was an affidavit attached. Management rules and procedure. That is correct. It came from the police. LAPD produces each and every year a new LAPD manual. This particular manual, this particular site, page 177, came from the relevant manual 2000, which tells plaintiff how he is to return to work, what the specifics are. If we look at Exhibit P, page 182, the police department, when they have these ---- I'm sorry. I was looking at 177. You don't want me to switch to 182? Well, I wanted to get ---- because I only have two minutes and seven seconds, and I have a lot of pretext to give you. I mean, I had ---- I'll give you as much time as you need. Okay. So you just be careful. Okay. All right. If you look at page 182 of Exhibit P provided to this court ---- Okay. I'm with you. May 3, 1996. Right. 1996 order, special order. This is a special order written by the chief of police. Okay. Willie Williams in 1996, which this was the existing policy in 2000, that actually identified when employees of LAPD were actually referred to behavioral science. According to the testimony of Lieutenant Crecci, which is contained in Exhibit ---- You're going a little too fast for me. You started with page 177, 71170. What there were you looking at in particular? I was looking at how the department returns employees back to duty. And this would be which category, non-IOD? Non-IOD, mental stress illnesses, things that are not injury related. Not workers' comp, in other words. Whenever an employee goes out on a medical leave or a stress leave, since it's not actually identified, it just says IOD injury or illness sworn. And then it also talks about the non-IOD injury or illness sworn, which gives you both categories of how an employee returns to duty after they've been out on an illness. And what does it say? It says when an employee returns, okay, for the IOD injury, in case the defendants wanted to classify it as an IOD, here's what the qualification states. When an employee returns to duty from injury or illness status, the employee commanding officer shall cause a duty certificate form PDS 43 to be completed. Prior to returning to duty from an IOD injury, an employee shall be examined by a doctor, not a multiple of doctors, a doctor designated by the workers' comp division or the personnel department. The doctor will, if appropriate, provide authorization to return to duty. Here's the second set of circumstances, a non-IOD injury. When a sworn employee returns to duty from a non-IOD injury or illness, the concerned commanding officer may require a sworn employee to report as soon as possible to medical services division personnel department for examination. When an employee returns to duty, the employee supervisor shall complete the duty section of the non-occupational sick or injury form 130. If the absence is for less than eight days, if the absence is eight days or more, a duty certificate form PDS 43 shall be completed. The employee's commanding officer shall review the required form and cause it to be distributed. And you said this was all complied with? And that was complied with, PDS. Now you give us the chief's special order. Right. How does that help you? Well, that helps because behavioral science, according to Lieutenant Cretchey, he stated is his reason, which the court identified, the reason why Officer Chavez was sent to behavioral science is because when he came back to work, he only came back to work with his own private physician's full return to duty. And he felt that that was not sufficient. So he wanted to send him somewhere to a doctor to be evaluated by the city's doctor so that there would be no issue of culpability, which is feasible. This was done. And this was done on March the 20th, 2000. Dr. Angela Donahue, a city doctor, evaluated Officer Chavez, phoned Lieutenant Cretchey, told him he can return to patrol duty. Well, what about this requirement that Lieutenant Lutz says, you know, I've got this requirement that he's got to go do this other thing? Your Honor, I think that was because what the statement made by Angela Donahue, Dr. Donahue, was not what the city wanted to hear. Do you have any evidence that they treated other people differently? Well, I sure do, but it wasn't submitted to the lower court.  It's not in the record. But I want you to keep in mind that in this case, Lieutenant Lutz in his own declaration states, which I don't understand why the court even used this declaration, states, I have no recollection of speaking with Lieutenant Glenn Cretchey about Officer Chavez. This gentleman writes a declaration without any personal knowledge that he even spoke to Lieutenant Cretchey about sending plaintiff to all these various doctors. You're over your time. Okay, I'm sorry. Do you have more pretext? Well, I do have more pretext, Your Honor. Quickly, we have the same thing. We're on the record. We find them if we look for the pretext. The pretext would be Dr. Angela Donahue, the city doctor. Great. Thank you. Her declaration. Thank you, counsel. What makes your argument in Olshan versus the United States? Oh, this is in the real Olshan. So this is Nielsen, really, the trustee here. Counsel, ready? Thank you.
judges: Beezer, Noonan, Schwarzer